UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DARION EZELL DEANDRE
PARKER,

       **Petitioner,**

  v.                                           Case No. 21-CV-1361

BRIAN CAHAK,

       **Respondent.**

---

### REPORT AND RECOMMENDATION ON PETITION
### FOR WRIT OF HABEAS CORPUS

---

The Honorable Judge J.P. Stadtmueller has referred this matter for a report and recommendation as to whether Darion Ezell Deandre Parker is entitled to habeas relief under *Lafler v. Cooper*, 566 U.S. 156 (2012). For the reasons further explained below, I recommend that Parker's petition for writ of habeas corpus be granted.

### BACKGROUND

Parker, who is currently incarcerated at the Oshkosh Correctional Institution, sought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket # 1.) Parker was convicted of one count of second-degree recklessly endangering safety and two counts of armed robbery, threat of force, all as a party to a crime. (*Id.* at 2.) Parker was sentenced to 18 years of incarceration followed by 14 years of extended supervision. (*Id.*) Parked raised four grounds for relief in his habeas petition, each claim grounded in the alleged ineffective assistance of his trial counsel. (*Id.* at 6–9.) The court screened the petition and set a briefing schedule. (Docket # 16.) After the parties briefed the petition, Judge Stadtmueller issued a

decision dated January 21, 2025 denying several of Parker's claims as procedurally defaulted and denying several others on their merits. (Docket # 36.) The sole remaining ground for relief is Parker's claim that trial counsel, Attorney Jessica Bellows, was constitutionally ineffective during the plea stage of the proceedings because she gave him insufficient time to consider a plea offer on the morning of trial and failed to inform Parker either of the maximum sentence or the likely sentence that he faced if he took that offer before advising him to reject it. (*Id.* at 39–40.) The Wisconsin Court of Appeals rejected Parker's argument, finding that Parker had known the maximum penalties he faced since his initial appearance and noting that sentencing decisions rest within the trial court's discretion. (*Id.* at 40.)

Judge Stadtmueller concluded that the Wisconsin Court of Appeals unreasonably applied the clearly established Supreme Court precedent as set forth in *Lafler v. Cooper*, 566 U.S. 156 (2012). (*Id.* at 41–43.) He further concluded, however, that it was unclear whether Parker could demonstrate deficient performance and prejudice because the record required further factual development. (*Id.* at 45.) Judge Stadtmueller referred this matter for an evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases and to issue a report and recommendation as to whether Parker is entitled to relief under *Lafler*. (*Id.* at 47–48.) I conducted an evidentiary hearing on April 18, 2025. (Docket # 45.) Parker testified at the hearing, as did Attorney Bellows.

### EVIDENTIARY HEARING

*1.    Parker's Testimony*

Parker testified that he was charged in Milwaukee County Case No. 2014-CF-4284 on October 2, 2014. (Evidentiary Hearing Tr. ("Tr.") at 7, Docket # 45.) He first met his trial counsel, Attorney Bellows, on October 10, 2014 at his preliminary hearing. (*Id.*) Parker spoke

2

Case 2:21-cv-01361-JPS    Filed 09/05/25    Page 2 of 19    Document 51

with her outside of the courtroom for a couple of minutes prior to the hearing regarding waiving the preliminary hearing. (*Id.*) Bellows advised Parker to waive the hearing, and he followed her advice. (Tr. 7–8.) Parker testified that on October 22, 2014, Bellows visited him while he was in custody at the Milwaukee County pretrial detention facility to provide him with discovery. (Tr. 9.) They spoke about the discovery for about twenty minutes that day. (*Id.*)

Parker testified that he next saw Bellows at the Milwaukee County Jail on January 14, 2015, the day after his final pretrial conference. (Tr. 10.) Parker testified that he was not present for the final pretrial conference because Bellows waived his appearance without discussing it with him first. (Tr. 10–11.) Parker states that he questioned Bellows as to why she waived his appearance, and the two "kind of bumped heads." (Tr. 11.) Parker asked Bellows to withdraw from his case as he was upset about her waiving his appearance without consulting him. (*Id.*) He testified that he was concerned about how Bellows was handling his case, specifically, she was telling him that he did not have a defense—to which he disagreed— and she was not doing enough work on the case. (Tr. 13.) Parker testified that this meeting lasted about 30 minutes. (Tr. 12.)

Bellows moved to withdraw on January 16, and a hearing was held on the motion on January 20, 2015. (Tr. 13.) Parker testified that he spoke with Bellows off the record during the hearing, because he decided to keep her as his counsel. (Tr. 14.) Parker stated that he decided to keep Bellows because the trial court judge, Judge Dennis Moroney, told him that if a new attorney was appointed and he did not like this new attorney, he would probably have to retain his own counsel. (*Id.*) Parker testified that he did not want "to get another attorney that was just as bad as her." (*Id.*) Parker stated that his conversation with Bellows

lasted approximately two minutes that day, and she assured him that she was going to do her best with his case. (Tr. 14–15.)

Parker next saw Bellows on January 22, when she visited him in-person at the Milwaukee County facility to discuss a plea deal from the state. (Tr. 15–16.) Parker testified that the offer presented was to dismiss one armed robbery count and the second degree recklessly endangering safety charges if Parker pleaded guilty to one count of armed robbery. (Tr. 16.) Parker testified that Bellows did not discuss with him the maximum possible sentence he would receive under this agreement. (*Id.*) Also, Parker had a prior armed robbery conviction from 2011 and a pending revocation at the same time as his 2014 case. (Tr. 17.) Parker testified that Bellows did not discuss with him how the plea would affect his revocation, or whether any sentence he received under the plea agreement would be consecutive or concurrent to his revocation. (Tr. 17–18.)

Parker did agree, however, that because he had a prior armed robbery conviction and Judge Moroney also presided over that case, he was aware that the maximum sentence would be about 40 years. (Tr. 16–17.) Parker testified that Bellows spoke to him about this plea offer for under 10 minutes and presented very little information about it. (Tr. 18–19.) Parker told Bellows that he was not taking the offer and testified that he rejected it because the maximum penalty of 40 years presented too high an exposure. (Tr. 19.) While Parker was unhappy with this specific offer, he testified that he never told Bellows that he absolutely wanted to go to trial or that he was not interested in hearing other offers from the state. (*Id.*)

Parker next saw Bellows on the day of his trial, January 26, 2015. (Tr. 20.) Parker testified that he was brought to the courthouse early in the morning and was taken to the bullpen, which is a holding cell in the Safety Building. (Tr. 21.) Bellows came to talk to him

4

in the bullpen, and told him that the state presented a new plea deal in which it would dismiss the two counts of armed robbery if he pleaded guilty to the second-degree recklessly endangering safety charge. (Tr. 22–23.) Parker testified that he asked Bellows to "break it down" for him, meaning to explain how much time he would spend in prison and how much time he would spend on extended supervision. (Tr. 23.) Parker testified that Bellows did not explain the possible penalties he would face at sentencing, nor did she tell him how a recklessly endangering safety charge differed from the armed robbery charges. (*Id.*) Parker did, however, have some idea that the penalties might be different, but he did not specifically know and Bellows did not give him an estimate of what his sentence might look like if he took the plea offer. (Tr. 24.) Parker testified that this conversation with Bellows lasted about five minutes, which he remembers because there was a clock on the wall outside of the bullpen. (Tr. 25.) He states that Bellows failed to answer any of his questions and walked away while he was still trying to ask her questions. (Tr. 25–26.) He testified that although Bellows received a copy of the proposed plea agreement, she did not give him a copy or review it with him. (Tr. 26.)

Because Judge Moroney previously sentenced Parker to two years in custody for one armed robbery, Parker testified that he never considered that Judge Moroney would sentence him to 18 years in this case and Attorney Bellows never warned him about the possibility of a significant jump in sentence. (Tr. 27.) He states that he would have liked more time to consider the plea offer and if he had more time, he would have accepted the plea and not gone to trial, as he now knows that the maximum time he would have faced under that plea deal was 10 years. (Tr. 27–28.)

### 2. *Attorney Bellows' Testimony*

Attorney Bellows testified that she was appointed through the State Public Defender's office to represent Parker in Milwaukee County Case No. 14-CF-4284. (Tr. 63.) At the time of her representation of Parker, Bellows had been practicing criminal defense law for approximately 10 years. (Tr. 62–63.) Bellows testified that her case notes from her file accurately reflect the times and dates she communicated with Parker. (Tr. 68, Ex. 5.) Bellows' case notes indicate that she received Parker's case on October 8, 2014 and first met with him on October 10, 2014 at the preliminary hearing. (Tr. 69, Ex. 5.) Bellows spoke to Parker by telephone on October 15, 2014 and conveyed the first plea offer to him (although she could not recall what this initial offer was), and told him the next court date. (Tr. 69, 72.) She also reviewed the discovery that day; thus, she would have spoken to him about that as well. (Tr. 69.) Bellows' notes further indicate that she met with Parker on October 22, 2014, and had short telephone calls with him on October 23 and October 24, 2014. (Ex. 5.)

Bellows testified that she communicated with the district attorney prosecuting Parker's case, Kimberly Schoepp, on January 6, 2015, via email. (Tr. 73, Ex. 4.) Schoepp was touching base with Bellows regarding where they stood on going to trial, further plea negotiations, and the status of Parker's revocation. (*Id.*) On January 12, ADA Schoepp emailed Bellows stating that Bellows never got back to her about negotiations but that Schoepp understood "that the offer [was] plea to court [sic] 3, dismiss and read in counts 1 and 2 with prison to the court." (Ex. 4.) Attorney Bellows' notes indicate she attended the final pretrial conference on January 13, 2015 (Ex. 5 at 2), met with Parker on January 14, 2015 (*id.* at 1), and subsequently drafted and filed a motion to withdraw on January 16 (*id.*). Bellows attended the motion to withdraw hearing on January 20, 2015. (Ex. 5 at 1.)

Bellows' notes show that she had a short telephone conference with Parker on January 22, 2015 (Ex. 5 at 2) and also met with him in person that day (*id.* at 1). Bellows prepared for trial on January 23, January 24, and January 25, 2015. (*Id.* at 1.) Trial began on January 26, 2015. (*Id.* at 2.) Attorney Bellows testified that it was not uncommon for the state to present a new plea offer on the morning of trial and ADA Schoepp did so in Parker's case. (Tr. 108.) She stated that as soon as she got the new offer, she would have reviewed it with Parker while he was in the bullpen. (Tr. 111.) Although Bellows could not recall how long her conversation with Parker lasted, she testified that depending on the circumstances, these types of meetings could last anywhere from a few minutes to half an hour. (Tr. 112.) Bellows testified that in Parker's case, she probably would have gone back and forth between the bullpen and the courtroom several times that morning. (Tr. 113.)

While Bellows could not specifically remember the details of her conversation with Parker on the morning of trial, she testified that in preparing for the evidentiary hearing, she reviewed her case notes (which are not the same as Exhibit 5). (Tr. 126–27.) Her case notes indicated that the state's offer was dismissal of the two armed robbery counts if Parker pleaded guilty to the second-degree recklessly endangering safety count with a maximum initial confinement of five years. (*Id.*) The state was to remain silent as to whether that sentence was consecutive or concurrent to his revocation. (Tr. 74.) Bellows testified that she was confident that she explained to Parker the state's final offer because "it was a drastic difference" that significantly reduced his exposure time for initial confinement and extended supervision. (Tr. 82–83.) She also stated that in a situation like Parker's, she would have advised him to take the offer based on the drastic reduction; however, she always told her clients that they had to make the ultimate decision. (Tr. 83.)

7

Despite this explanation, Bellows testified that Parker rejected the offer, which she indicated in her notes by writing "rejected" under the offer. (Tr. 83, 127.) At the start of Parker's trial, Judge Moroney acknowledged this final offer and that it had been rejected that morning and that he would no longer accept any plea offers that did not include all of the charges once trial commenced. (Tr. 116.)

## ANALYSIS

Again, the only ground for relief remaining in Parker's habeas petition is his argument that Attorney Bellows was constitutionally ineffective during the plea stage of the proceedings because she allegedly gave him just minutes to consider the morning-of-trial plea offer and did not tell him the likely sentence that he faced if he took that offer before advising him to reject it. (Docket # 36 at 39–40.)

Whether Parker is entitled to habeas relief on this ground depends on whether Parker has met the standard for ineffective assistance of counsel at the plea-bargaining stage as articulated in *Lafler*. In *Lafler*, the Supreme Court makes clear that a defendant's Sixth Amendment right to counsel extends to the plea-bargaining process. 566 U.S. at 162. The Court further found that the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984) applies to challenges to guilty pleas based on ineffective assistance of counsel. *Id.* at 162–63. "Under the familiar two-pronged test of *Strickland*, [a petitioner] must show both that his attorney's performance was deficient and that he was prejudiced as a result." *Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015). In *Lafler*, the parties agreed counsel's performance was deficient, so the Court was left to address how to apply *Strickland*'s prejudice test where "ineffective assistance results in a rejection of the plea offer and the defendant is

convicted at the ensuing trial." 566 U.S at 163. The Court concluded that to establish prejudice, a defendant must show that:

> [B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 164. In this case, the Wisconsin Court of Appeals concluded that Parker could not demonstrate prejudice associated with Bellows' alleged failure to advise him of the likely sentence he would receive if he accepted the plea offer because sentencing decisions rest within the trial court's discretion and trial counsel cannot promise a defendant a specific disposition. (*Id.* at 42.)

Judge Stadtmueller concluded that the court of appeals' decision ran afoul of the clearly established Supreme Court precedent in *Lafler*. (*Id.*) He stated that Parker's alleged facts, if true, would show both deficient performance and prejudice under *Strickland*. I am tasked, based on the testimony and evidence gathered at the evidentiary hearing, with evaluating whether Parker has established both deficient performance and prejudice under *Lafler*.

1. *Deficient Performance*

I begin with the question of deficient performance. Both Parker's and Bellows' memories have understandably faded in the decade since the events of January 26, 2015 took place. Bellows often had no specific memory of the events in question and testified regarding her usual practices with criminal defense clients, as well as some contemporaneous notes and time sheets from the case. (Tr. 67, 70–71, 105, 126–27.) Bellows' lack of memory is

9

unsurprising; at the time of her representation of Parker, Bellows had represented hundreds of criminal defendants and was undoubtably handling multiple cases contemporaneous with Parker's. (Tr. 65, 113.) Parker, on the other hand, testified that although some of the dates are a little hazy, he has a pretty good memory of what transpired during his case. (Tr. 6–7.) This is also unsurprising; Parker had only one case to focus on—the one where his freedom was on the line. He was also in custody while awaiting trial and could focus primarily on the criminal charges and his defense.

Parker's and Bellows' accounts of the bullpen conversation start off generally consistent. Both testified that Parker was brought to the courthouse early that morning, at approximately 8:00 a.m. or 8:30 a.m. (Tr. 21, 108–09.) Bellows' time sheet indicates she began working at 8:15 a.m. that day. (Ex. 5 at 2.) Neither could remember how long Parker was in the bullpen when Bellows came to speak with him. (Tr. 22, 113.) The parties also agree that their meeting was short. Parker testified that his conversation with Attorney Bellows lasted about five minutes, which he remembers because there was a clock on the wall outside of the bullpen (Tr. 25); whereas Bellows testified that she could not remember how long their conversation lasted, but noted that these sorts of conversations usually lasted anywhere from a few minutes up to half an hour (Tr. 111–12).

Parker also agrees that Bellows generally communicated what the offer was. He testified that Bellows informed him that the state's new offer was to dismiss the two "main" charges, being the two armed robbery charges, and plead guilty to the second-degree recklessly endangering safety charge. (Tr. 22–23.) He also testified that Bellows mentioned something about the district attorney "staying silent," although he was unsure what that meant. (Tr. 23–24.) This comports with Bellows' testimony regarding the morning-of-trial offer being Parker

10

pleads guilty to the second-degree recklessly endangering safety charge, the state dismisses and reads in the two armed robbery charges, and the state would remain silent as to whether the sentence was consecutive or concurrent to Parker's revocation. (Tr. 74.)

Parker also acknowledges that he had a general sense that the state's new offer would reduce his prison exposure time. Indeed, Parker testified that he knew from his initial appearance that he was facing significant prison time if convicted of two counts of armed robbery and one count of second-degree recklessly endangering safety. (Tr. 34.) Parker was aware that just one count of armed robbery carried a maximum sentence of 40 years, which is why he rejected the state's initial offer to plead guilty to one count of armed robbery. (Tr. 38–39.)

Where the parties' accounts diverge, however, is with Bellows' alleged explanation, or lack thereof, regarding the details of the deal, specifically, the potential time of initial confinement versus supervised release and how Parker's revocation would affect his sentence. While Bellows could not remember the specifics of her conversation with Parker that morning, she testified that she was "almost positive" that she would have explained to Parker "time in and time out," and what they might be facing if they lost at trial versus the State's recommendation, stating that she saw a note about it in her file. (Tr. 79.) She further testified that there would never be a situation in which she would not explain to a client the difference between consecutive and concurrent sentences because it could add time onto the sentence the client was already serving. (Tr. 83–84.) Bellows testified that whether the state stays silent on this issue is a "pretty important component" of the deal because the sentencing court typically follows the state's recommendation. (*Id.*) And based on Parker's testimony, he did

11

hear Bellows mention at least something about the state "staying silent," which was the aspect of the deal addressing his revocation.

It seems that it is at this point that the conversation goes awry. Parker testified that when he asked Bellows for further explanation, to "break down" the plea offer, she responded irritated, asking him are "you going to take it or not?" (Tr. 25.) Parker testified that when he told Bellows that he would not take the deal if he did not know what was going on, Bellows walked off quickly while he was still asking her questions. (Tr. 25–26.) Parker testified that the entire interaction felt rushed; he wanted more time to understand how the offer impacted his potential prison time and then consider whether he would accept the offer. (Tr. 26–28.)

On this record, I find that given the undisputed time crunch faced by Attorney Bellows, it is likely that she did not explain the plea offer to Parker in the manner she described as her usual practice. Again, there is no dispute that she relayed the offer. But Bellows, though understandable given the passage of time, does not recall the specifics of her conversation with Parker. Although she testified that she was positive that she explained to Parker the time in and time out and what they might be facing if they lost at trial, she testified in terms of her usual practice and what she would have done, rather than what she recalled doing. It also rings credible that given the time crunch Bellows faced the morning of trial that she was in a hurry to know whether Parker was going to take the deal or not, even though Parker still had questions about the deal, as he testified.

Looking at the evidence as whole, there was likely another factor at play during this last-minute plea discussion. The events of the morning of trial cannot be divorced from the context of the attorney-client relationship as a whole, which was far from positive and trusting. Parker had requested Bellows withdraw from his case after she waived his

12

appearance at the final pretrial conference, which he testified he did not authorize. (Tr. 10–11.) Parker testified that the two "bumped heads," that he argued with her, and that their relationship "was detrimental." (Tr. 11–12.) Parker testified that Bellows did not believe he had a defense and that the state simply needed to "connect the dots," to which Parker disagreed. (Tr. 13, 47–48.) However, he decided to keep Bellows because she reassured him that she would do her best (Tr. 15) and because Judge Moroney told him he would have to hire his own attorney if he did not like the next one and he thought the next attorney would not be any better (Tr. 14, 46).

Given this history, Bellows likely needed to spend more time with Parker to make sure he understood the offer and what he was passing up. And what is undisputed is that Bellows did not have much time the morning of trial. This, in my view, explains Parker's testimony that the meeting felt rushed, that Bellows was not answering his questions, and that Bellows did not "break down" the deal for him. This history also suggests that Parker had the ability to respond to reassurances and reason as he did with the motion to withdraw. Had Bellows reassured Parker with more details on the offer, such as communicating his likely sentence or the expected sentence range, he likely would have followed her advice there too.

There is, of course, another possible reading of the evidence: that Bellows did follow her usual practice and fully explained the plea offer and how it compared to what would happen if they lost at trial, and that Parker regrets his choice to go to trial. And in considering this view of the evidence, I weighed the fact that Parker has a personal interest and incentive to couch his testimony in a favorable light. But even considering Parker's interest in the outcome of this litigation, there is more record evidence that Bellows did not fully explain the deal offer to him. Again, it is undisputed that Bellows did not have much time in the bullpen

13

the morning of trial. Further, Bellows conceded that although she had appeared in front of Judge Moroney many times (Tr. 78), she did not discuss with Parker Judge Moroney's sentencing practices, including his sentencing history on similar types of charges, how he reviewed recidivist defendants, or any expected sentence range (Tr. 115, 128).

Additionally, while criminal defendants risk trial for various reasons, both wise and foolish, that Parker risked trial because Bellows did not fully explain the plea offer rings the more plausible version of the events. Parker knew that armed robbery charges carry the potential for 40 years each and that this deal was dismissing the two "main charges" that carry this maximum exposure. With the second-degree recklessly endangering safety charge carrying a maximum penalty of 10 years, even with the revocation issue, Parker stood to fare much better under the state's morning-of-trial plea deal. Additionally, there is no evidence that Parker told Bellows that he wanted to go to trial at all costs. While he rejected the earlier plea offer, he did so because his sentencing exposure was too high, not because he was claiming innocence or insisting on trial. Given Parker's testimony that facing 40 years on a 50/50 chance was too big of a risk but facing 10 years on a 50/50 chance was not (Tr. 58), it seems highly unlikely that Parker would have rejected this plea deal had he received full information on the potential sentence he was facing and had he been given sufficient time to consider his options.

The state argues that Parker's demand for a speedy trial indicates his desire to go to trial all along. (Docket # 48 at 19.) I find this argument unpersuasive. While a speedy trial demand sometimes indicates a defendant's commitment to proceed to trial, as Bellows testified, making a speedy trial demand is a common occurrence. (Tr. 85.) It is often filed for other, strategic reasons. And Parker testified that he brought up the speedy trial demand to

14

Bellows because he was hearing from "a lot of guys in the county" that if a speedy trial demand is made early on, the state "got to let you go on a bracelet or got to come to plea." (Tr. 54–55.) In other words, Parker believed that a speedy trial demand might cause the state to move quicker on getting him a plea offer or could get him released on bond. (*Id.*) Thus, Parker testified that the request "was more strategy than anything else." (Tr. 55.)

For these reasons, I recommend that the Court find that (1) Bellows did not have sufficient time to fully explain the plea offer to Parker and that (2) she did not convey to Parker a likely sentence or sentence range that he would face under the morning-of-trial plea offer. While Bellows could not have guaranteed Parker a specific sentence from Judge Moroney, Bellows failed to give Parker any prediction or likelihood of the potential sentence he could receive to help him evaluate the offer. Accordingly, I recommend that the Court find Bellows' performance deficient under *Lafler*.

2. *Prejudice*

The analysis, however, does not end there. Parker is only entitled to habeas relief under *Lafler* if he can also demonstrate a reasonable probability that but for Bellows' errors, the plea offer would have been presented to the court, Parker would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances, the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *Lafler*, 566 U.S. at 163–64.

It is undisputed that the state would not have withdrawn the plea deal due to intervening circumstances. (Docket # 48 at 16.) It was the state that approached Bellows with the plea deal on the morning of trial and the state had previously presented Bellows with offers

15

in Parker's case and expressed a willingness to listen to counter-offers. (Ex. A, Docket # 44-1 at 2.)

The state also does not dispute that that Judge Moroney would have accepted the offer's terms. (Docket # 48 at 16.) Bellows testified that in her experience, the judges she appeared before did not typically reject plea negotiations and in her opinion, she did not believe Judge Moroney would have rejected it. (Tr. 114.) Rather, the record shows that at the beginning of Parker's trial, Judge Moroney stated that because trial had started, he would no longer accept any plea deals that did not include all of the charges. (Tr. 116.) But there is no indication that Judge Moroney would not have accepted such a deal *prior* to the start of trial.

Further, it is undisputed that under the plea's terms, Parker would have received a less severe sentence. (Docket # 48 at 16.) Parker testified that he was concerned about the "time in/time out" calculation, meaning the time he spent in prison versus the time he spent on extended supervision. After trial, Parker was sentenced to 32 years, consisting of 18 years of incarceration followed by 14 years of extended supervision. Parker undoubtedly would have fared better under the state's morning-of-trial offer. Again, a second-degree recklessly endangering safety charge carried a potential maximum sentence of 10 years. (Tr. 28.) Assuming that Parker received the maximum sentence of 10 years and the sentence (however unlikely) consisted of serving the entire 10 years in prison, 10 years in prison is still significantly less than 18 years in prison. And considering the sentence as a whole, 10 years in total is significantly less than 32 years.

The state, however, asserts that even if Bellows was deficient, Parker failed to demonstrate that he was prejudiced by Bellows' errors. (Docket # 48 at 16.) I disagree. Parker had previously pled guilty to an armed robbery. Moreover, Parker testified that if Bellows

16

had explained the plea deal to him and if he had more time to consider it, he would have taken the deal and not gone to trial. (Tr. 27.) As discussed above, neither Bellows nor Parker testified that Parker was set on going to trial all along. Rather, Parker testified that he did not want to go to trial and he only rejected the initial plea deal because the 40-year exposure he continued to face was too great. (Tr. 39.) Even believing he had a 50/50 chance of success at trial, Parker testified that if he faced only 10 years in prison, he would not have rolled the dice and gone to trial. (Tr. 58.)

Thus, I recommend that the Court find that Parker has also established prejudice under *Lafler*.

3. *Remedy*

I write briefly to address Parker's potential remedies under *Lafler*. The *Lafler* Court stated that Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and not unnecessarily infringe on competing interests. 566 U.S. at 170. The Court went on to say that the specific injury suffered by a defendant who declines a plea offer due to ineffective assistance of counsel and then receives a greater sentence at trial "can come in at least one of two forms." *Id.*

As relevant here, the Court stated that in situations where "an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial," resentencing alone will not fully redress the constitutional injury and the "proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal." *Id.* at 171. "Once this has occurred, the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id.* at 172.

The Court noted that in implementing this remedy, the trial court must weigh various factors as "elaborated over time in decisions of state and federal courts"; however, it articulated the following two specific considerations:

> First, a court may take account of a defendant's earlier expressed willingness, or unwillingness, to accept responsibility for his or her actions. Second, it is not necessary here to decide as a constitutional rule that a judge is required to prescind (that is to say disregard) any information concerning the crime that was discovered after the plea offer was made. The time continuum makes it difficult to restore the defendant and the prosecution to the precise positions they occupied prior to the rejection of the plea offer, but that baseline can be consulted in finding a remedy that does not require the prosecution to incur the expense of conducting a new trial.

*Id.* at 171–72. I have not been tasked with recommending a remedy for the constitutional violation, nor have the parties briefed the issue. I note, however, that should the chosen remedy be specific performance of the original plea agreement, the state should be ordered to reoffer the plea agreement and:

> Presuming respondent accepts the offer, the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed.

*Id.* at 174.

**NOW, THEREFORE, IT IS RECOMMENDED** that petitioner's petition for writ of habeas corpus be **GRANTED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing

18

Case 2:21-cv-01361-JPS   Filed 09/05/25   Page 18 of 19   Document 51

procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 5th day of September, 2025.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

19

Case 2:21-cv-01361-JPS   Filed 09/05/25   Page 19 of 19   Document 51